**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PHILADELPHIA METAL TRADES | : | |
| COUNCIL, MTD, AFL-CIO, ET AL., | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ADMIRAL THAD W. ALLEN, ET AL., | : | NO. 07-145 |
| Defendants | : | |

**MEMORANDUM AND ORDER**

GENE E.K. PRATTER, J.                                                        AUGUST 21, 2008

Only vessels built in the United States are eligible to operate in United States coastwise trade.[1]  The present action involves the interpretation of federal law aimed at protecting the American shipbuilding trade.  The ultimate issue presented here is whether the Coast Guard erred in ruling that using equipment modules manufactured abroad, but attached to vessels in shipyards in the United States, does *not* disqualify those vessels from being considered American-built under the Jones Act.  Although at first blush this dispute may appear to demand diving into the specialized world of naval architecture, ultimately the rigorous grammar lessons of an English teacher provide the ballast for the Court's decision.

Plaintiffs Philadelphia Metal Trades Council, MTD, AFL-CIO ("PMTC") and Metal

---

[1]In this context, the coastwise trade consists of "the transportation of merchandise by water, or by land and water, between points in the United States to which the coastwise laws apply, either directly or via a foreign port."  46 U.S.C. § 55102(b).  With certain exceptions delineated in 46 U.S.C. § 55101(b), the "coastwise laws apply to the United States, including the island territories and possessions of the United States."  46 U.S.C. § 55101(a)

Trades Department, AFL-CIO ("MTD")[2] argue pursuant to the Administrative Procedure Act, 5

U.S.C. §§ 702-706 ("APA"), that the United States Coast Guard ruled in an arbitrary and

capricious manner when it determined that certain of Aker Philadelphia Shipyard, Inc.'s ("Aker")

tankers will qualify as "built in the United States" for the purposes of Section 27 of the Merchant

Marine Act of 1920, 46 App. U.S.C. § 883 (the "Jones Act")[3] and Coast Guard Regulation 46

C.F.R. § 67.97 (2006), even though the tankers will contain large, foreign-built equipment

modules.

Plaintiffs commenced this action against the Coast Guard, and its Commandant, Admiral

Thad W. Allen, as well as the National Vessel Documentation Center ("NVDC"), and its

Director, Thomas L. Willis (together, "Government Defendants"). The Court permitted both

Aker and General Dynamics NASSCO ("NASSCO") to intervene as party-defendants in support

of the Government Defendants' position. Presently before the Court are Plaintiffs' Motion for

Summary Judgment, Government Defendants' Motion for Summary Judgment, Aker's Motion

for Summary Judgment, and NASSCO's Motion for Summary Judgment. For the reasons set

forth below, the Court will deny Plaintiffs' Motion and grant Defendants' motions.

---

[2]Plaintiff PMTC is an unincorporated labor organization comprised of members who work for Aker Philadelphia Shipyard, Inc. MTD is an unincorporated labor organization that acts on behalf of PMTC and its employees in lobbying and litigation efforts.

[3] The provisions of 46 App. U.S.C. § 883 were recodified by Pub. L. 109-304 (Oct. 6, 2006) and are now contained in various sections of Title 46 U.S.C. Chapter 121, Documentation of Vessels (46 U.S.C. §§ 12101-12152) and Title 46 U.S.C. Chapter 551, Coastwise Trade (46 U.S.C. §§ 55101-55121).

I.     **LEGAL STANDARD**

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).   An issue is "genuine" if a reasonable fact-finder could possibly hold in the non-movant's favor with regard to that issue.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law.  Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the

"underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

On cross motions for summary judgment, the same standards and burdens apply.  See, Applemans v. City of Philadelphia, 826 F.2d 214, 216 (3d Cir. 1987); Peters Township School Dist. v. Hartford Accident and Indemnity Co., 833 F.2d 32, 34 (3d Cir. 1987).  Cross motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material face exist.

Transportes Ferreos de Venezuella II Ca v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).  Of course, when presented with cross motions for summary judgment, the Court must consider the motions separately.  See, Williams v. Philadelphia Housing Authority, 834 F.Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994).

"Summary judgment is especially appropriate in cases such as this where the Court is called on to review a decision of an administrative agency.  In these cases, what is often in issue are not the facts, but whether the agency erred in applying the law."  Keystone Shipping Co. v. U.S., 801 F. Supp. 771, 776 (D.D.C. 1992).  See also, C. Wright & A. Miller, *Federal Practice and Procedure* § 2733 (2d ed. 1990).[4]

---

[4]All parties here agree that the Administrative Record in this case is complete.  See, Tr. 4/17/08 at 58.

## II.     BACKGROUND

### A.     Relevant Statutes and Regulations

In relevant part, the United States shipping laws require that "merchandise" transported by water between points within the United States (via domestic or foreign port) must be transported in a vessel that was "built in the United States."  46 U.S.C. § 883 <u>recodified</u> <u>at</u> 46 U.S.C. § 12112.[5]  The Coast Guard has administrative responsibility for certifying vessels for the purposes of the Jones Act.  The applicable regulations deem a vessel to be "United States built" if (1) "[a]ll major components of its hull and superstructure are fabricated in the United States"; and (2) "[t]he vessel is assembled entirely in the United States."  46 C.F.R. § 67.97.

As Aker aptly explains by way of introduction of the issues here:

> A vessel is not a monolith; it consists of many parts or components.  Of those components, only those that qualify as "major components of the hull or superstructure" must be fabricated (or built) in the United States.  Other components may be fabricated elsewhere, but all components, regardless of where they are build, must be installed into or added to the vessel in the United States.

Aker Motion at 17.  Accordingly, the issue permeating years of procedural wrangling is what exactly constitutes a "part" or "component."  In many respects, for purposes of the economic impact of this dispute, this case represents an example of the adage that the whole can indeed be greater – or at least more coastwise – than the sum of its parts.

---

[5]Prior to codification of the Appendix, Section 27 of the Jones Act authorized vessels for coastwise trade provided that they were "vessel[s] built in and documented under the laws of the United States..."  46 App. U.S.C. § 883.

**B.     Procedural History[6]**

Plaintiffs contend that the Coast Guard acted contrary to applicable statutes, and its own regulation, in determining that ten Veteran Class MT-46 Product Tankers being constructed by Aker would be eligible for Certificates of Documentation with coastwise endorsements.

According to the Administrative Record, on October 5, 2004, Kvaerner Philadelphia Shipyard ("KPS"), Aker's predecessor in interest, submitted a request to the NVDC requesting confirmation that the inclusion of "certain foreign-built engine room-related macro modules in the construction of new build vessels" would "not adversely affect the coastwise eligibility of the vessel[s]." AR at 352. KPS described the modules at issue as follows:

> Specifically, KPS is contemplating the procurement of large foreign-built engine room-related macro modules consisting of equipment, and other supporting systems and outfitting, to be grouped into two-deck modules that would be incorporated into the construction of a vessel in its yard in Philadelphia. Outfitting of the modules would include machinery components and foundations, equipment, piping, switchboards, cabling, lighting, stairs, ladders, railings, and floor grating. Each of the modules would have self-supporting foundations that are not integral to the hull or superstructure and do not contribute to, or affect in any way, the structural integrity or watertight envelop of the hull. Each module will be installed by the shipyard using stiffeners welded or bolted to the deck or bulkhead.

Id.[7] KPS included enclosures providing information and design drawings for the three modules

---

[6]The parties' statements of undisputed facts are taken almost exclusively from documents in the Administrative Record ("AR"), a 409-page document submitted to the Court as part of the summary judgment motions. Accordingly, in discussing relevant facts for this Memorandum, the Court cites the Administrative Record unless required to do otherwise.

[7]The macro modules addressed by the NVDC's December 2004 determination letter are not being used in the construction of the tankers at issue. Aker Motion at 6, n.5. Rather, smaller micro modules are presently at issue. Aker avers that this fact can be derived from the record by comparing the descriptions and drawings of the proposed macro modules submitted with KPS's October 2004 request with pictures of the smaller modules actually being used. Compare, AR at 357-63 and AR at 323-25. See also, Tr. 4/17/08 at 34.

at issue.  See, id. at 354-363.

The NVDC issued a letter on December 6, 2004 finding that "incorporation of the macro modules described will not result in a finding that the tanker is not built in the United States for vessel documentation purposes."  AR at 351.  The letter explained that:

> The Coast Guard has consistently held that items not integral to the hull or superstructure, such as propulsion machinery, machinery, consoles, wiring, certain mechanical systems and outfitting have no bearing on a U.S. build determination.  We have also held that the use of small engine room equipment modules of foreign origin will not affect a U.S. build determination.
> [KPS's] submissions show that KPS wished to use macro modules, which would be incorporated into the construction of the tanker at the KPS yard in Philadelphia.  Each module is self-supporting and independent of the vessel's structure.  The self-supporting foundations of the modules are not integral to the hull or superstructure.  Although the modules are fixed in place to restrict movement, they neither contribute to the overall integrity of the vessel nor comprise part of the watertight envelop of the hull.  Outfitting of the modules would include machinery components and foundations, equipment, piping, switchboards, cabling, lighting, stairs, ladders, railings, and floor gratings.
> Based on the representations in your letter and the accompanying enclosure, the Coast Guard finds that incorporation of the macro modules described will not result in a finding that the tanker is not built in the United States.

Id.

In preparation of the production of the ten Veteran Class MT-46 Product Tankers, on April 25, 2006, Aker submitted a request to the NVDC for a ruling that these tankers would be deemed to have been built in the United States for the purpose of the Jones Act, and its implementing regulations, and, thus, eligible for coastwise trade.  See, AR at 339-350.[8]  Aker

---

[8]Through its April 26, 2006 request for an NVDC ruling, Aker sought confirmation of four previous NVDC determinations.  Aker Motion at 6, n.4.  The prior rulings are as follows: (1) the December 2004 ruling discussed supra; (2) a February 22, 2002 determination that a foreign-built stern section constituting approximately 0.68% of the containership's total steel weight was not a major component of the hull, see, AR at 385; (3) an October 9, 2002 determination that a foreign-built bow thruster constituting approximately 0.54% of the vessel's total steel weight was not a major component of the hull, see, id. at 383; and (4) an April 21, 2003 determination that the incorporation of certain foreign-built engine room equipment

-7-

sought confirmation that "engine room equipment modules are not integral to either the hull or superstructure" and that the tankers would "be eligible for a Certificate of Documentation endorsed for coastwise trades upon the completion of Work." Id. at 341.  At the request of the NVDC, Aker provided additional information on May 2, 2006.  See, id. at 330-337.

In May 2006, PMTC and MTD submitted a request that the NVDC rule on Aker's April 25, 2006 request for a build determination confirmation.  See, AR at 224-329.  The plaintiff unions asked the NVDC to "rule that the Veteran Class NT-46 product tankers currently being constructed will *not* qualify as 'built in the United States' for purposes for the Jones Act because of the extensive prefabrication and preassembly performed in South Korea." Id. at 225.  PMTC and MTD revised the request for a ruling on May 23, 2006.  See, id. at 124-223.

On May 24, 2006, the Director of the NVDC ruled that Aker's tankers would comply with the law, and in so doing, the Director determined that Aker's use of certain foreign pre-assembled and pre-outfitted equipment modules and piping systems did not violate the statute or the regulations.  See, AR at 122-123.  The Director found that the inclusion of these modules and systems in the tankers was proper because of a "long-established corollary principle[]," that "the Coast Guard has consistently held that items not integral to the hull or superstructure, such as propulsion machinery, consoles, wiring harness and other outfitting have no bearing on a U.S. build determination and may, therefore, be foreign built without compromising the coastwise eligibility of a vessel." Id. at 122.[9]  The NVDC warned, however, that if the modules at issue

_____

modules would not preclude the issuance of a certificate of documentation endorsed for the coastwise trade.  See, id. at 381.

[9]Government Defendants explained during the April 17, 2008 hearing on the pending motions that such modules cannot exceed a certain size without compromising their structural

were "attached or joined in a foreign yard," then the "'assembled in the United States' test would

be impacted." Id. at 123.[10]

On June 22, 2006, PMTC and MTD submitted an appeal of the latest NVDC ruling. See,

AR at 7-118.   The unions challenged various Coast Guard findings not at issue in this case, but

also challenged the finding that the equipment modules at issue could be assembled outside the

United States without affecting the Jones Act's requirement that ships be "assembled entirely in

the United States."  Specifically, they argue that the assembly of the modules themselves should

be considered an integral part of the assembly of the vessel and, thus, should occur on U.S. soil.

The unions contend that while parts may be manufactured abroad, *all* assembly must occur in the

United States.  Id. at 10-13.

The Coast Guard denied the appeal on November 15, 2006.  See, AR at 1-6.  The Coast

Guard first noted that while "manufactured parts" may be constructed outside the United States,

the "complete machine" must be assembled in the United States.  Id. at 3.  The Coast Guard

considers the modules to be manufactured parts, while the tanker itself is the complete machine.

> This interpretation is consistent with prior rulings not solely confined to the issue of
> modules.  Many items of equipment and outfit, including entire propulsion systems, are
> manufactured, or "assembled", foreign [sic] but have not thereby been precluded from use
> in the "assembly" of vessels in the United States as a condition of those vessels'
> compliance with [the Jones Act].

---

integrity.  Foreign contractors would have to attach an extremely large module to a structural part
of the vessel to protect its structural integrity.  At that point, the foreign construction would
violate the Jones Act.  Accordingly, module construction is self-limiting.  See, Tr. 4/17/08 at 33-
35 ("And that's the beauty of the Coast Guard's self-limiting test because you have to be able to
put [a module] into a certain area on the ship and it has to be free from the structure of the ship.
And in order to do that, it is self-limiting in its size.")

[10]Aker has never asserted any intention to attach the modules to the tankers in a foreign
shipyard – or any shipyard except its facility in Philadelphia.

Id. at 3.  The Coast Guard warned that adoption of PMTC and MTD's position "might well require, if taken as literally as [their] argument would permit, that every nut or bolt incorporated into a vessel, or into any of its outfit or equipment, undergo 'assembly', or 'preassembly', in the United States."  Id. at 4.

Following the denial of their appeal, PMTC and MTD filed this suit.  Plaintiffs allege that the NVDC/Coast Guard ruling violates the APA and the Jones Act because the ruling allows Aker to outsource assembly and pre-outfitting of certain equipment modules and piping systems to foreign facilities, thus reducing the work available to American shipyard employees, contrary to the protections guaranteed by the Jones Act.  They seek a court order declaring that the Coast Guard's ruling, and all other Coast Guard rulings relying on the challenged interpretation underlying this dispute, to be arbitrary and capricious.  Plaintiffs also seek injunctive relief restraining the Government Defendants from giving effect to the challenged interpretation, enjoining the Government Defendants from issuing any Certificates of Documentation based upon that interpretation, and requiring the Government Defendants to rescind any previously issued Certificates of Documentation that were premised on the challenged interpretation.[11]

III.    DISCUSSION

A.    Plaintiffs' Standing to Bring This Action

Aker asserts that Plaintiffs do not have standing to challenge the Coast Guard

---

[11]Pursuant to 46 U.S.C. § 12106 and 12135, and 46 C.F.R. § 67.173, a Certificate of Documentation may be invalidated and subject to cancellation upon a determination that the issuance of the certificate was improper for any reason.

determinations at issue in this action because a decision in Plaintiffs' favor would not redress their alleged injuries.[12]  Plaintiffs argue that they have sufficiently established their standing in this action.

In order to demonstrate standing to bring a case in federal court, a plaintiff must establish three elements.  The plaintiff first must have suffered an "'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  Second, a causal link between the alleged injury and the conduct at issue must exist.  "Third, it must be 'likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id.  At the summary judgment stage, Federal Rule of Civil Procedure 56 requires a plaintiff seeking summary judgment to go beyond the pleadings and submit specific admissible evidence establishing its standing, including redressability.  Id. at 561.

Aker argues that Plaintiffs have failed to establish the third element of the standing test because they have not established that a favorable decision in this action will provide meaningful relief for their alleged injury.  Plaintiffs claim to have suffered a loss of work for their members because of the Coast Guard's ruling.  However, Aker asserts that Plaintiffs mistakenly assume that the "work that the Coast Guard permitted to be accomplished by a South Korean contractor (fabrication, assembly and outfitting of equipment modules and piping systems) would, if the Coast Guard's determination were overruled, be accomplished directly by Aker in the

---

[12]The Government Defendants and NASSCO do not join Aker in challenging Plaintiffs' standing.

[Philadelphia] shipyard."  Aker Motion at 11.  However, Aker avers that the work could just as easily be completed by an American subcontractor whose employees are not affiliated with the plaintiff unions.  Plaintiffs acknowledge as much in their Complaint.  See, Complaint ¶ 15 (noting that the work could be performed "at the shipyard itself, or at other contractor or subcontractor facilities located within the United States.").  See also, AR 38, AR 39, AR 40, AR 109-11, AR 114-15.  Akers argues that this "admission necessarily means that plaintiffs lack standing to challenge the Coast Guard rulings, because they are unable to establish that this Court's overrruling of the Coast Guard's determination would redress the loss of work they claim to have suffered."  Aker Motion at 11.

Aker relies upon Defenders of Wildlife.  In Defenders of Wildlife, the Supreme Court held that:

> When, ...as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*,...causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction -- and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.  Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

504 U.S. at 561-62 (internal quotation marks and citations omitted).

In this action, Plaintiffs allege that "but for the rulings of the NVDC and the Coast Guard allowing the pre-assembly and pre-outfitting of equipment modules and piping systems in foreign facilities, [Aker] bargaining unit employees would be performing the assembly and pre-outfitting

of the modules and systems for the Product Tankers."  Complaint ¶ 8.  However, Aker argues

that while Aker is a party to this action (unlike the third parties in <u>Defenders of Wildlife</u>) this

Court, like the court in that case, cannot control or predict Aker's "exercise of broad and

legitimate discretion" in responding to a decision setting aside the challenged Coast Guard

rulings, and Plaintiffs cannot "adduce facts showing that those choices have been or will be made

in such a manner as to produce causation and permit redressability of injury".  <u>Defenders of

Wildlife</u>, 504 U.S. at 562.  "Setting aside the Coast Guard rulings might force Aker to have the

module assembled and outfitted in the United States, but it would not require the work to be done

at Aker's facility by plaintiffs' members."  Aker Motion at 12-13.[13]  Accordingly, Aker argues

that Plaintiffs lack standing to challenge the Coast Guard rulings.

     Plaintiffs argue that they have presented facts sufficient to establish standing in this

action.  They challenge Aker's presentation of the third element of standing.  Plaintiffs assert that

Aker is arguing that "in order to establish redressability, Plaintiffs must prove that...their

injury...*will* be cured by a favorable ruling from this Court.  In other words, Aker argues that the

Plaintiffs must establish that the Court's ruling will require the work to be performed at the

_____

[13]Dave Meehan, President and Chief Executive Officer of Aker, submitted a signed
declaration as part of Aker's Reply to Plaintiffs' Opposition to Aker's Motion (Doc. No. 69).
Mr. Meehan asserts that if Aker were not allowed to purchase the equipment modules from
foreign suppliers, then the company would "have [the work] performed by pipe fitting and
equipment module subcontractors in the United States, who can perform [these tasks] more
efficiently and at a lower cost [than Aker employees in Philadelphia]."  Id., Ex. 1 at 2.
Accordingly, Aker argues that a holding in Plaintiffs' favor would not redress the alleged injuries
suffered by the plaintiff unions' members.
     Although the Court acknowledges Mr. Meehan's position with Aker and his ultimate
control over decisions concerning the business, the Court notes that, as composed, Mr. Meehan's
declaration remains mere conjecture at this point rather than fact.

Philadelphia Shipyard." Plaintiffs' Opposition to Aker Motion at 4-5. See, Aker Motion at 10-13.

The requirement of redressability "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conductive to a realistic appreciation of the consequences of judicial action." Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982). Accordingly, while a plaintiff may fail to establish standing if the prospect of obtaining relief from a favorable ruling is unduly speculative, "a plaintiff need not show beyond a question that a favorable judgment would redress his or her injury." 15 James Wm. Moore, Moore's Federal Practice § 101.42[4] (3d ed. 2007) (case citations omitted). Rather, "[a] probabilistic benefit from winning a suit is sufficient." Id.

Plaintiffs urge the Court not to rely on Defenders of Wildlife. In Defenders of Wildlife, organizations dedicated to wildlife conservation filed suit against the Department of the Interior ("DOI") challenging its decision to stop requiring all other federal agencies to consult with the DOI to insure that actions they "funded, authorized or carried out" on foreign soil would not jeopardize endangered or threatened species within those countries. 504 U.S. at 558. The Supreme Court first found that the plaintiffs did not have standing because they suffered no injury in fact and, thus, the Court reached the redressability argument after already determining the plaintiffs lacked standing regardless of the redressability of their alleged injuries. Id. at 562-67.

The crux of the Supreme Court's secondary analysis of redressability was that none of the

entities which could truly impact endangered species, i.e., the other federal agencies, which would be required to consult with the DOI should the suit be successful, were parties to the case. The Supreme Court held that the district court's decision "would not have been binding upon the agencies. They were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." Id. at 568-69.

Aker admits in its brief that Plaintiffs do not suffer from such a problem in this case because Aker is a party to the action. Aker Motion at 12. Plaintiffs argue that the relief sought by Plaintiffs unquestionably would be binding on Aker. "If the Court rescinds the Coast Guard's rulings or prohibits the agency from making similar rulings in the future, Aker will have to comply with the Court's rulings or risk the possibility that the Coast Guard may determine that its Product Tankers fail to comply with 46 C.F.R. § 67.97(b) and, hence, may not be deemed 'built in the United States' for purposes of coastwise trade." Plaintiffs' Opposition to Aker Motion at 10-11. Accordingly, the limitations expressed in Defenders of Wildlife are not applicable to the parties this case. Aker, unlike the agencies acting in Defenders of Wildlife, is a party to the case and, thus, must heed the rulings of this Court.

Moreover, Plaintiffs offer additional support for their argument that they have standing in this action. In Society Hill Towers Owners' Assoc. v. Rendell, 210 F.3d 168 (3d Cir. 2000), a group of homeowners sued the City of Philadelphia and the Department of Housing and Urban Development alleging that the defendants had failed to perform the required environmental and historical reviews and had failed to hold meaningful public hearings before approving the construction of a hotel and parking garage on land near the plaintiffs' neighborhood. The plaintiffs claimed that the construction project would result in increased pollution, traffic and

noise, thereby injuring them by decreasing their property values and their enjoyment of the area. Id. at 176.  The defendants contested standing, in part on the issue of redressability, arguing that even if the court ruled in the plaintiffs' favor, the ruling would require only that the government conduct hearings and reviews.  Such a ruling could not guarantee what the plaintiffs' sought: a drastically different construction project or no construction project at all.  The Third Circuit Court of Appeals found that the plaintiffs had standing, holding that "the alleged injury *may well be* redressed if the City is required to more fully evaluate the environmental and historic impacts of the proposed project."  Id. at 177 (emphasis added).

Plaintiffs further assert that if the Court requires the Coast Guard to set aside its rulings and thereby compel Aker to assemble its Product Tanker equipment modules in the United States in order to qualify the vessels for coastwise trade, it is likely that the employees at the Philadelphia Shipyard, members of plaintiff unions, will perform that assembly work.  Plaintiffs present a Second Declaration of Gary Gaydosh, president of the PMTC and an equipment operator at the Philadelphia Shipyard, to support of this assertion.

Mr. Gaydosh's Second Declaration presents evidence for four arguments.  First, the employees represented by the plaintiff unions already have the skills and experience to perform the work on the Product Tanker modules due to their prior experience constructing containerships.  See, Second Gaydosh Decl. ¶¶ 5, 11.  See also, Plaintiff's Opposition to Aker Motion at 8.  Second, some of the equipment required to assemble the equipment modules is already at the Philadelphia Shipyard.  See, Second Gaydosh Decl. ¶¶ 5, 7, 12.  Third, Aker has no shipyards or assembly/outfitting facilities in the United States except the Philadelphia Shipyard, and other commercial shipyards in the United States with capabilities to assemble the equipment

are owned by Aker's competitors.  Id. ¶ 13.  Fourth, throughout this action, Aker has repeatedly

sought to protect the details concerning the design of its Product Tankers.  See, e.g., Aker Motion

for Protective Order (Doc. No. 39).  However, because the assembly of portions of the Product

Tankers is being performed at Aker, Philadelphia Shipyard employees, who are represented by

plaintiff unions, already have access to the design materials.  See, Plaintiffs' Opposition to

Motion for Protective Order, Ex. 4 (Decl. Of Gary Gaydosh) ¶ 4-7 (Doc. No. 45).  See also,

Second Gaydosh Decl. ¶ 14.  Accordingly, Plaintiffs argue that Aker's "documented concerns

about dissemination of the confidential material necessary to assemble equipment modules

would be assuaged *only if* the assembly took place at Aker, as opposed to at any other location or

under the auspices of any other employer in the United States."  Plaintiffs' Opposition to Aker

Motion at 9.

Because Aker is a party to this action and, thus, must abide by the rulings of the Court,

and because Plaintiffs have shown that their injuries may well be redressed by a favorable ruling

in the action, the Court concludes that Plaintiffs have standing here.

**B.    The Standard of Review Under the Administrative Procedure Act**

The Administrative Procedure Act empowers the Court to "hold unlawful and set aside

agency action, findings and conclusions found to be...arbitrary, capricious, an abuse of discretion

or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the

'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that

of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ass'n, 463 U.S. 29, 43

(1983).  The "arbitrary and capricious" standard set forth in the APA requires an agency like the

Coast Guard or NVDC to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" <u>Id.</u> (quoting <u>Burlington Truck Lines, Inc. v. U.S.</u>, 371 U.S. 156, 168 (1962). By way of further description, the Supreme Court has articulated for regulatory agencies a wide berth for exercising their respective missions:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Id.</u>

When the Court is called to review a decision of an administrative agency, if Congress has spoken to the exact question at issue, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.</u>, 467 U.S. 837, 842-843 (1984). However, no party to this action argues that Congress expressed an unambiguous intent to require that vessels transporting merchandise between points within the United States must be "built in the United States," 46 U.S.C. § 883 <u>recodified at</u> 46 U.S.C. § 12112. Whereas, "if the statute is silent or ambiguous as to the specific issue," as the parties agree it is here, the Court must defer to an agency's interpretation that "is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843. The Court must not defer to an interpretation that is plainly inconsistent with the statute. <u>See</u>, <u>e.g.</u>, <u>Mercy Catholic Med. Ctr. v. Thompson</u>, 380 F.2d 142, 152 (3d Cir. 2004) ("We owe no deference to an agency interpretation plainly inconsistent with the relevant statute."); <u>Clean Ocean Action v. York</u>, F.3d 328, 333 (3d Cir. 1995) ("An agency guideline or directive that conflicts with the

plain meaning of a regulation is invalid.")

Plaintiffs aver that a court must not defer to an agency's interpretation of a regulation when the language of the regulation is unambiguous. Plaintiffs' Motion at 19. See, Christensen v. Harris County, 529 U.S. 576, 588 (2000) (deference to agency's interpretation of its own regulation is warranted "only when the language of the agency's regulation is ambiguous"). To be sure, however, the Court has a role well beyond that of rubber-stamping agency action with the patina of approval. See, e.g., Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 346 (4th Cir. 2001). In other words, "deference is not abdication." EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 260 (1991) (Scalia, J., concurring). Nonetheless, if an agency regulation is ambiguous and does not compel only one reasonable interpretation, the Court must give more weight to the agency's interpretation. Thus, Defendants argue that the Court must view the Coast Guard's rulings in this case through the legal lens of Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945), and its progeny if the Court finds that the Coast Guard regulation is ambiguous. Under the Seminole Rock standard of deference, the Court must give "controlling weight" to the agency interpretation unless it is "plainly erroneous or inconsistent with the regulation." Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). See also, Long Island Care at Home, Ltd. v. Coke, 127 S. Ct. 2339, 2345-46 (2007). Accordingly, the Court "must defer to [the Coast Guard's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [Coast Guard's] intent as the time of the regulation's promulgation.'" Id. (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria

necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)).  This is especially true where, as here, "[t]he subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which...Congress entrusted the Agency to work out."  Long Island Care at Home, 127 S. Ct. at 2346.

> The Third Circuit Court of Appeals has further explained this concept as follows:
>
> The arbitrary and capricious standard focuses a court on the agency's process of reasoning. To determine whether an agency acted arbitrarily and capriciously, a court looks to whether the agency relied on factors outside those Congress intended for consideration, completely failed to consider an important aspect of the problem, or provided an explanation that is contrary to, or implausible in light of, the evidence. Reversal [of the agency action] is appropriate only where the administrative action is irrational or not based on relevant factors.

NVE Inc. v. Department of Health & Human Servs., 436 F.3d 182, 190 (3d Cir. 2006) (internal citations omitted).  "[M]uch deference is afforded to the agency; an action will not be deemed arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available....  Rather, we require that the agency's action be rationally related to the purpose to be served, and supported by the facts found in the record."  Yeboah v. U.S. DOJ, 345 F.3d 216, 223 (3d Cir. 2003) (internal citation, quotation marks and alterations omitted).  See also, Director, Office of Workers' Compensation Programs, U.S. Dep't of Labor v. Mangifest, 826 F.2d 1318, 1324 (3d Cir. 1987) (explaining that a court must consider "how the agency connects its position to the language of the regulation in order to evaluate its plausibility").

Thus, it becomes necessary for the Court to consider the applicable regulations.

C.      **Plain Meaning of 46 C.F.R. § 67.97(b)**

Coast Guard regulations directly address the documentation of vessels.  Section 67.97

provides that "[t]o be considered built in the United States[,] a vessel must meet both of the

following criteria: (a) [a]ll major components of its hull and superstructure are fabricated in the

United States; and (b) [t]he vessel is assembled entirely in the United States."  46 C.F.R. §

67.97(a) & (b).  While the Coast Guard has defined the terms "vessel" and "United States,"[14] it

has not defined "component," "assembled" or "entirely."

"When interpreting statutes or regulations, the first step is to determine whether the

language at issue has a plain and unambiguous meaning.  The inquiry ends if the statutory

language is unambiguous and the statutory scheme is coherent and consistent."  Dodrek v.

Phelan, 419 F.3d 259, 263 (3d Cir. 2005) (citations omitted).  In the absence of a regulatory

definition, the Court should apply the plain and ordinary meaning of the words in a regulation,

and here the key words are "assembled" and "entirely."  See, Malat v. Riddell, 383 U.S. 569, 571

(1966) (per curiam) ("As we have often said, 'the words of statutes...should be interpreted where

possible in their ordinary, everyday senses.'") (quoting Crane v. Commissioner, 331 U.S. 1, 6

(1947)).  Virtually by definition, an appropriate source for obtaining the plain and ordinary

meaning of a word or phrase is an English language dictionary.  See, U.S. v. Lachman, 387 F.3d

_____

[14]The Coast Guard's regulations define "vessel" as "every description of watercraft or other contrivance capable of being used as a means of transportation on water, but does not include aircraft."  46 C.F.R. § 67.3 (2006).  The regulations further define "United States" as follows: "when used in a geographic sense means the States of the United States, Guam, Puerto Rico, the Virgin Islands, American Samoa, the District of Columbia, the Northern Mariana Islands, and any other territory or possession of the United States, except that for purposes of §67.19(d)(3) trust territories are not considered to be part of the United States."

42, 51 (1st Cir. 2004) ("Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulation."); <u>Director, Office of Workers' Comp. Programs. v. Gardner</u>, 882 F.2d 67, 71 (3d Cir. 1989) (observing regulations did not define or otherwise modify "1 year" and referring to dictionary for definition of "year").

Plaintiffs argue that the Court should find that the plain meaning of "assembled entirely" requires that summary judgment be granted on their behalf.  Plaintiffs' Motion at 20-23. Plaintiffs cite <u>Webster's Ninth Collegiate Dictionary</u>, which defines the verb form "assemble" as "to bring together" or "to fit together the parts of."  <u>Webster's Ninth Collegiate Dictionary</u> at 109 (1989) (""<u>Webster's Dictionary</u>").  <u>See also</u>, <u>American Heritage Dictionary of the English Language, New College Edition</u> at 79 (1976) ("<u>American Heritage Dictionary</u>") (defining "assemble" as "to bring or gather together into a group or whole" or "a fitting together of parts").[15]  <u>Webster's Dictionary</u> also defines the adverb "entirely" as "to the full or entire extent: completely" or "to the exclusion of others: solely."  <u>Webster's Dictionary</u> at 415.  <u>See also</u>, <u>American Heritage Dictionary</u> at 437 (defining "entirely" as "wholly; completely" or "solely; exclusively").

Plaintiffs argue that when the dictionary definitions of "assemble" and "entirely" are applied to the language of 46 C.F.R. § 67.97(b), "the plain meaning of the unambiguous language becomes self-evident.  The plain meaning...is that the fitting together of manufactured parts into a complete vessel, or a structure or unit of the vessel, must be performed exclusively in the United States."  Plaintiffs' Motion at 22.

---

[15]Plaintiffs turn to the definition of the noun "assembly" for further support of their position.  <u>See</u>, <u>Webster's Dictionary</u> at 109 (Defining "assembly" as "the fitting together of manufactured parts into a complete machine, structure or unit of a machine").

Plaintiffs disregard the meaning of the word "parts," however.  Merriam-Webster's Collegiate Dictionary defines a "part" as "(1) : one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole (2) : an essential portion or integral element."  Merriam-Webster's Collegiate Dictionary, 11th ed. at 902-03 (2003) ("Merriam-Webster's Dictionary").  The same dictionary defines a component as "a constituent part."  Id. at 255.  Plaintiffs do not address the uncertainty that remains over what constitutes a vessel "part."[16]

The Government Defendants assert that Plaintiffs' view of the plain meaning of the Coast Guard regulation is incorrect.  According to these Defendants, Plaintiffs ignore the basic subject of the regulatory phrase, namely, the vessel itself.  See, 46 C.F.R. § 67.97(b) ("The vessel is assembled entirely in the United States.").[17]  The regulation does not address the assembly of parts for the vessel.  Government Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 6.  They argue that Plaintiffs' focus on the assembly of individual parts is misplaced.

Second, the Government Defendants challenge Plaintiffs' focus on the noun "assembly" rather than the verb "assemble."[18]  See, supra, n.15.  Plaintiffs note that the Webster's Dictionary

---

[16]This case demonstrates that one need not be a Shakespeare scholar to appreciate the possibly determinative significance of the most modest or ubiquitous "part."  See, William Shakespeare, King Richard III, act v, sc. 4 ("A horse! a horse! my kingdom for a horse!"); George Herbert, Outlandish Proverbs (1640) ("For want of a naile the shoe is lost, for want of a shoe the horse is lost, for want of a horse the rider is lost.")

[17]Aker also embraces this argument.  See, Defendant Aker's Opposition to Plaintiffs' Motion for Summary Judgment at 4-5 ("Aker Opposition").

[18]Aker attacks Plaintiffs' attempt to use definitions of the noun "assembly" to support their arguments about the verb "assemble."  "'[A]ssembly,' as defined by plaintiffs, is not the noun form of 'assemble.'  Rather, it is a discrete word whose meaning is irrelevant for purposes of interpreting the subject regulation, which does not contain that word." Aker Opposition at 3-4.

definition of "assembly" is the "fitting together of manufactured parts into a complete machine, structure, or unit of a machine," but in doing so, Plaintiffs suggest that the Court should consider "assembly" to be the fitting together of the parts of both the whole and its subunits.  However, Government Defendants' note that the definition is written in the disjunctive, not the conjunctive, and, thus, sets out three alternative meanings for assembly.  Accordingly, because the statute unquestioningly refers to the assembly of the vessel, not the assembly of its parts, the Court should focus on the portion of the definition of "assembly" dealing with the whole of the structure, not individual parts.  See, Government Defendants' Opposition at 6-7.  Government Defendants argue that it "is only through [Plaintiffs'] grammatical switch that the unions can argue that the assembly of a vessel (machine) also must necessarily include the assembly of an equipment module (a unit of the machine)."  Id. at 7.

Government Defendants urge the Court to find that the plain and unambiguous meaning of the regulation is as the Coast Guard has interpreted it – that the vessel itself, not every individual part, must be assembled entirely in the United States.  See, Government Defendants' Opposition at 10.  In the alternative, they urge the Court to find that the language of the Coast Guard regulation is ambiguous and, therefore, the agency interpretation must be granted deferential treatment.  Id.

Having waded into the more than 400 pages devoted by these parties to their arguments about the "clarity" of this regulation, the Court finds that the regulation is ambiguous because neither Plaintiffs' interpretation of it nor the Coast Guard's interpretation is the *only* reasonable interpretation.  Therefore, the Court must evaluate the merits – or lack thereof – of the Coast Guard's interpretation of it here.

**D.** **Whether the Coast Guard's Interpretation of 46 C.F.R. § 67.97(b) is Plainly Erroneous or Inconsistent with the Regulation**

Plaintiffs argue that even if the regulation is ambiguous, the Coast Guard's interpretation is plainly erroneous.  Plaintiffs draw upon two statements made by the NVDC in its May 24, 2006 ruling to Aker to make their point: (1) "to the extent such modules were to be attached or joined in a foreign yard, the 'assembled in the United States' test would be impacted," and (2) the test was not impacted in Aker's case "because the modules are to be attached in Philadelphia." AR at 121.  Plaintiffs assert that the interpretation of 46 C.F.R. § 67.97(b) presented by way of these statements "permit[s] the assembly of the equipments [sic] modules to be performed outside the United States, provided only that the final attachment of those modules into the vessel is performed in the United States."  Plaintiffs' Motion at 23.  Plaintiffs argue that such an interpretation goes directly against the requirement that the *entire* vessel be assembled in the United States.

Plaintiffs assert that while Aker could purchase from foreign vendors the individual parts composing each module – i.e., piping, electrical controls, lighting, stairs, ladders, railings and floor grating – "once Aker...purchased these manufactured parts for use in the construction of the vessels for the coastwise trade, the fitting together of these parts – even if incorporated into 'equipment modules'... – must be performed exclusively in the United States."  Id. at 24.[19]  If the

---

[19] In its November 15, 2006 letter denying Plaintiffs' appeal of prior NDVC rulings, the Coast Guard noted that if Plaintiffs' argument about assembling the entire vessel in the United States were "taken as literally as [their] argument would permit, that every nut or bolt incorporated into a vessel, or into any of its outfit or equipment, undergo 'assembly', or 'pre-assembly', in the United States.  The concept of vessels deemed to have been 'assembled', even 'assembled entirely', in the United States, has never been accorded that breadth."  AR at 4.

only subparts of the vessel that must be assembled entirely in the United States are the "major components of the hull and superstructure," then American shipbuilders would have the capacity to build only "floating envelope[s]," not functional ships, thus going against the very purpose of the Jones Act: protecting the American shipbuilding industry.  Id. at 25.[20]  Plaintiffs argue against allowing more of what they term "preassembly" to take place outside the United States which necessarily denies American union members work.  However compelling as a matter of national pride and the economic well-being for an important segment of out community Plaintiffs' goals undeniably may be, the Court cannot consider Plaintiffs' organizational raison d'etre regarding the interpretation of the Coast Guard regulation.  The Court is constrained to limit the judicial role to determining only whether the NVDC and Coast Guard rulings are arbitrary and capricious.

Defendants urge the Court to find that the Coast Guard's interpretation of the regulation is reasonable in terms of the text, history and purpose of the Jones Act, see, Global Crossing Telecomms., Inc. v. FCC, 259 F.3d 740, 744 (D.C. Cir. 2001) (reasonableness of agency determination assessed in light of "Act's text, legislative history, and purpose") (citation

---

[20] Notwithstanding their arguments, Plaintiffs admit that the foreign manufacture of a main engine does not violate the Coast Guard regulation even under Plaintiffs' interpretation. See, Plaintiffs' Opposition to Aker Motion at 17-18.  Aker notes that the manufacturing of massive main engines for tankers and other vessels "necessarily involves pipe fabrication (cutting, shaping, welding and installing piping) and installation of pumps and their electrical wiring and controls."  Aker's Reply to Plaintiffs' Opposition to Aker Motion at 5.  This is precisely the sort of foreign work conducted on the equipment modules at issue, and the type of foreign work Plaintiffs' urge constitutes unacceptable foreign assembly under the Coast Guard's regulation.  Id.

omitted), to which the Court now turns.[21]

### 1.    Text

In their motions, Defendants assert that the Coast Guard's interpretation is consistent with the language of its own regulation because the interpretation employs the plain meaning of the pertinent words.  Under <u>Seminole Rock</u> deference, the Court must give "controlling weight" to the agency's own interpretation unless it is "plainly erroneous or inconsistent with the regulation." <u>Shalala</u>, 512 U.S. at 512.  NASSCO argues that "plaintiffs are hard-pressed to argue that the Coast Guard's interpretation is unreasonable given that only non-integral segments of the vessel's equipment – equipment not attached to the vessel outside the United States, and not suitable for operation independent of the vessel – were shipped here from Korea."  NASSCO Motion at 11.

As explained *supra*, the Coast Guard interpretation relies on the plain meaning of the words in the regulation in finding that the assembly of the whole vessel, not the assembly of every individual part, must occur in the United States.  See, supra § III.C (discussing the plain meaning of the text of 46 C.F.R. § 67.97(b)).  The Coast Guard's interpretation is neither plainly

---

[21] Plaintiffs filed a Notice of Supplemental Authority regarding the recent decision in <u>Shipbuilders Council of America v. U.S. Dep't of Homeland Security</u>, 551 F. Supp. 2d 447 (E.D.Va. 2008).  <u>See</u>, Doc. No. 77.  In <u>Shipbuilders Council of America</u>, the court examined Jones Act provisions controlling the rebuilding of ships, not those controlling original construction as in this case.  The court held that the Coast Guard's determinations concerning a ship being rebuilt in China were arbitrary because one determination was "unfaithful to the text, history, and purpose" of the Jones Act, <u>id.</u> at 456, while the other two determinations lacked the analysis of relevant factors, such as legislative history and congressional intent, necessary to support them under even the most deferential judicial review.  <u>Id.</u> at 456-61.  Because this case involves determinations based on the text, history and purpose of the Jones Act in relation to the original construction of tankers, Plaintiffs' supplemental authority is not directly applicable and does not change the Court's position on this case.  <u>See</u>, <u>infra</u> D(1)-(3).

erroneous nor inconsistent with the regulation.[22]  Because the Coast Guard interpretation is one

of at least two reasonable interpretations of the regulation (the other being that of the Plaintiffs),

under <u>Seminole Rock</u>, the Court must give the agency's interpretation controlling weight.

### 2.      Legislative History

The current language requiring a vessel, if it is to be considered "built in the United

States," to be "assembled entirely in the United States" was added to the vessel documentation

regulations in June 1982 as part of a complete revision of those regulations under the Vessel

Documentation Act of 1980, Pub. L. No. 96-594, 94 Stat. 3453-63 (Dec. 24, 1980).  <u>See</u>,

Documentation of Vessels, 47 Fed. Reg. 27,490, 27,498 (June 24, 1982) (promulgating 46 C.F.R.

§ 67.09-3(b)).  In the Notice of Proposed Rulemaking preceding the adoption of the final rule, the

Coast Guard explained that the Vessel Documentation Act of 1980 was "aimed at updating and

simplifying documentation procedures while avoiding any substantive modification in the areas of

citizenship, build, etc."  Documentation of Vessels, 46 Fed. Reg. 56,318 (proposed Nov. 16,

1981).

In relation to the issue at hand, a part of the 1981-1982 rulemaking process, which

produced the "major component" and "assembled entirely" tests of the current regulations, is the

Coast Guard's treatment of a third test: the "fifty percent of cost" test.  That third test was part of

---

[22] If this case turned upon a consideration of the agency's interpretation to permit all but the last tightening pull on a wrench to occur off-shore in order to meet the "assembled entirely in the United States" mandate, then there could, and should, be a serious question as to whether the Coast Guard's interpretation would pass a good faith reasonableness test.  However, that scenario is not presented here.

the regulation adopted in 1982, but is not included in the current regulation.  It read as follows:

> At least fifty (50) percent of the cost of all machinery (including propulsion) and components which are not an integral part of the hull or superstructure relates to items procured in the United States.

46 Fed. Reg. 56,341 (proposed 46 C.F.R. § 67.09-3(c)).  This provision required that at least half of the non-hull and non-superstructure components of a coastwise vessel be manufactured – both built and assembled – in the United States.  Aker argues that "[i]ts simultaneous adoption and existence alongside the requirement that such a vessel be 'assembled entirely in the United States' conclusively demonstrated that this latter provision was not intended or understood to require that *all* the vessel's components be assembled in the United States."  Aker Motion at 22.

In an October 1982 Advance Notice of Proposed Rulemaking, the Coast Guard asked: "Is the 'fifty (50) percent of cost' rule contained in 46 C.F.R. § 67.09-3(c) a valid basis for evaluating whether a vessel should be considered built in the United States?"  Documentation of Vessels, 47 Fed. Reg. 45,888 (October 14, 1982).  As a result of criticisms of the fifty-percent rule received during the 1981-1982 rulemaking and in response to the October 1982 Advanced Notice, the Coast Guard issued a Notice of Proposed Rulemaking in which it proposed to delete the rule from the definition of built in the United States.  Documentation of Vessels, 48 Fed. Reg. 20,249 (May 5, 1983).

In response to comments opposing the repeal of the fifty-percent rule, the Coast Guard replied:

> We believe Congress used the phrase "built in the United States" primarily to protect the United States shipbuilding industry rather than manufacturers....The Coast Guard believes that forcing shipyards in the United States or vessel owners to use less satisfactory or more costly equipment of U.S. manufacture in order to ensure that vessels will qualify for use in the domestic trades or the fisheries, or to do without items because they are not available

> from domestic manufacturers, adds an element of cost to shipbuilders, ship owners, and
> the public generally which is not required or justified by the Vessel Documentation Act.

48 Fed. Reg. 20,250-51.  The Coast Guard further explained that "built in the United States"

requirements could be adequately addressed by what now is 46 C.F.R. § 67.97(a)-(b).  "It is not

necessary for the Coast Guard to become involved in questions of where items which are not an

integral part of the hull or superstructure were procured in order to answer the basic question of

whether a vessel can reasonably by considered the product of United States shipyard."  48 Fed.

Reg. 20,251.

When the Coast Guard adopted the final rule in February 1984, it provided additional

explanation for its actions.  See, 49 Fed. Reg. 4944, 4945-46 (Feb. 9, 1984).  In rejecting any

suggestion that "a vessel should have 100% domestic content in order to be considered U.S.

built," the Coast Guard explained that it had never applied such criterion.  "The shipbuilder has

always been able to use foreign material in the hull and superstructure and has been free to install

*some foreign machinery and components*."  49 Fed. Reg. 4944 (emphasis added).

Aker argues regarding the fifty-percent rule that:

> [i]t would be difficult to find a regulatory issue in which an agency has given more careful
> and thorough consideration to a proposition or provided a more well-reasoned explanation
> for concluding that it is inconsistent with the relevant statute.  That same rationale
> supports the Coast Guard's similar rejection of plaintiffs' view that the "assembled
> entirely in the United States" provision requires every component to be assembled in the
> United States.

Aker Motion at 26.

Plaintiffs argue that the Court should ignore Aker's arguments regarding the fifty-percent

test because the arguments are based on a section of the regulation that was repealed over 20 years

ago.  Specifically, Plaintiffs assert that although the fifty-percent rule and the "assembled entirely

in the United States" rule were adopted simultaneously, such simultaneous adoption does not establish anything regarding the assembling of vessels.  Regardless whether a shipyard had to purchase components solely from American manufacturers or not, shipyards would be required to assemble those components into vessels "entirely in the United States."  However, without considering one way or the other the so-called fifty-percent rule, the Court must observe that Plaintiffs ignore the long history of rulings of allowing shipyards to include not only small foreign-made parts, but also major components and machinery made and even assembled offshore.

As far back as 1882, the Treasury Department, which was then the agency responsible for determining coastwise status, interpreted the predecessor to the Jones Act, which stated that "[v]essels built within the United States...may be registered" as eligible for coastwise trade.  Rev. Stat. § 4132, 118 Stat. 795-96 (1872).  The Treasury Department considered whether an "engine" of "foreign origin" would compromise the coastwise status of a vessel.  The agency concluded that the use of the foreign engine was fully permissible, provided that the engine was installed into the vessel in the United States.  NASSCO Motion, Addendum A.1 (Treas. Rul. 5227 (May 17, 1882)).  NASSCO argues that engines, like the modules at issue in this case, are composed of a large number of smaller component parts, thus requiring a degree of foreign assembly prior to their attachment to the vessel in the United States.

In 1909, the U.S. Attorney General issued a similar ruling.  In interpreting the phrase "built in the United States" as used in a customs statute, the Attorney General explained that incorporation of a "pump and evaporator" that were "purchased as a whole abroad" did not prevent a vessel from being considered "built in the United States."  <u>Customers Law-Drawback-</u>

<u>Steam Evaporator & Steam Pump Used in Construction of a Dredge</u>, 27 Op. Atty. Gen. 228, 239-

40, 1909 WL 479 (1909).  The Attorney General acknowledged that the pump and evaporator

were "essential and permanent parts of" the vessel.  <u>Id.</u>  But he nevertheless concluded that

> [t]here can be no doubt that this vessel was "built in the United States".... Of course, if the
> hull of a vessel, and the several fixtures thereto, be made separately elsewhere and nothing
> be done here but to put them together, such vessel would not be built in the United
> States....But the statute requires only that the vessel be built here, and not that each
> separate attachment or appliance be manufactured in the United States.

<u>Id.</u>  American certification "should not be refused because the materials which compose the pump

and evaporator were not assembled after importation but were purchased as a whole abroad."  <u>Id.</u>

NASSCO cites a number of similar rulings issued throughout the years by the various

agencies, including the Coast Guard, charged with implementing the "U.S.-build" requirement.

<u>See</u>, <u>e.g.</u>, NASSCO Motion, Addendum A.3 (Memorandum, U.S. Coast Guard Merchant Vessel

Documentation Division (Sept. 26, 1968)) (ruling that "foreign manufactured propulsion

machinery may be installed in an otherwise American-built vessel without affecting coastwise

privileges" and also noting that coastwise status has been upheld in the presence of foreign-made

equipment not an integral part of the hull or superstructure, including foreign-made radar and

navigation equipment, shafts and propellers, anchor windlasses, mooring winches, and oil

purifiers); NASSCO Motion, Addendum A.6 (Coast Guard Ruling (March 27, 2002)) ("Although

engines and other items not integral to the hull or superstructure...do not need to be of U.S. origin,

they must be installed in the U.S.); AR at 373 (Coast Guard Ruling (June 2, 2004)) (finding that

crane "designed and manufactured in Dusseldorf, Germany, and delivered in major components

for final assembly in New Orleans" would not compromise coastwise endorsement); AR at 381

(Coast Guard Ruling (April 21, 2003)) ("The Coast Guard has consistently held that items not

integral to the hull or superstructure, such as propulsion machinery, consoles, wiring harnesses, and other outfitting have no bearing on a U.S. build determination.... The foreign built [small engine room equipment] modules are integral to neither the hull nor the superstructure....").

NASSCO argues that if Congress believed that the present administrative approach to the U.S. build requirement was incorrect, then it would have corrected the error through legislative enactment.  NASSCO Motion at 15.[23]  Congress has amended the Jones Act numerous times since its inception and undertook major revisions and recodifications in 1983 and again just two years ago in 2006.  See, 46 U.S.C. App. § 883 (repealed), Historical and Statutory Notes (discussing 21 separate amendments made since 1920 to section requiring vessels in the coastwise trade to be "built in...the United States," none of which altered the language at issue in this case).  Congress' lack of action to amend a statute to overrule an agency's longstanding interpretation of a regulation "provide[s] further evidence – if more were needed – that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible." Barnhart v. Walton, 535 U.S. 212, 220 (2002).  See, also, Int'l Raw Materials v. Baker, 1988 U.S. Dist. LEXIS 4560, at *13 (E.D. Pa. 1988) (finding that because Congress amended an act three times without rescinding a particular regulation, an inference of Congressional approval existed).

---

[23]During the oral argument in this matter, NASSCO noted that

Congress could have overruled this approach if it wanted to....Congress has had every opportunity to be aware of this agency interpretation, both because some of the older interpretations actually are published and also because it's recodified and reenacted and amended the Jones Act on multiple occasions, asked for comments from the industry and from others.  And so I don't think there's any reason to think that Congress is unaware that this is the approach the agency has taken.  And Congress hasn't been shy in the past about overruling the agency on other related matters if it wants to.

Tr. 5/17/08 at 56-57.

Plaintiffs challenge NASSCO's assertions by arguing that this action stems from the interpretation of the Coast Guard regulation, not from the words of the regulation itself. Plaintiffs' Response to NASSCO Motion at 11. Thus, Plaintiffs point out that Congress' failure to rescind a regulation that all of the parties to this action fundamentally support does not prove anything useful for resolving this case. However, Congress does have the power to clarify its own statutes and, thus, to override both agency regulations and the agency's interpretation of those regulations if at odds with Congressional statutory intent. Congress' failure to take up a challenge during the lengthy history of consistent interpretation of the regulation at issue provides support for the Coast Guard's view of Congressional satisfaction with the Coast Guard's approach to the statute.

Although consistent prior interpretation is not a requirement for Chevron deference, see, Chevron, 467 U.S. at 863, the fact that the Coast Guard and its predecessor agencies have interpreted the statutory requirements consistently without Congressional interference logically serves to confirm the reasonableness of the Coast Guard's rulings at issue in this action. See, U.S. v. Nat. Ass'n of Securities Dealers, Inc., 422 U.S. 694, 719 (1979) (finding that a "consistent and longstanding interpretation by the agency charged with administration of the Act, while not controlling, is entitled to considerable weight."). Such deference to prior agency interpretation is appropriate because it reflects an "awareness of the practical expertise which an agency normally develops." Int'l B'hd of Teamsters v. Daniel, 439 U.S. 551, 566 n.20 (1979). Accordingly, the Court finds that the Coast Guard's application of the regulation has remained consistent over time and consistent with its statutory origins.

3.      **Purpose**

Although one purpose of the Jones Act is to protect and benefit domestic shipyards and

workers, Congress specified a number of other important purposes for the legislation.  In 1920

when the Jones Act was enacted, Congress stated its purpose as follows:

> it is necessary for the national defense and for the proper growth of its foreign and
> domestic commerce that the United States shall have a merchant marine of the best
> equipped and most suitable types of vessels sufficient to carry the greater portion of its
> commerce and serve as a naval or military auxiliary in time of war or national
> emergency....[I]t is hereby declared to be the policy of the United States to do whatever
> may be necessary to develop and encourage the maintenance of such a merchant marine.

Merchant Marine Act of 1920, Pub. L. No. 66-261, § 1, 41 Stat. 988 (1920).  Such policy goals

remain intact more than 80 years later and are embodied in the most recent statutory re-

codification of this Act:

> (a) Objectives.–It is necessary for the national defense and the development of the
> domestic and foreign commerce of the United States that the United States have a
> merchant marine–
> (1) sufficient to carry the waterborne domestic commerce and a substantial part of the
> waterborne export and import foreign commerce of the United States and to provide
> shipping service essential for maintaining the flow of the waterborne domestic commerce
> and foreign commerce at all times;
> (2) capable of serving as a naval and military auxiliary in time of war or national
> emergency;
> (3) owned and operated as vessels of the United States by citizens of the United States;
> (4) composed of the best-equipped, safest, and most suitable types of vessels and manned
> with a trained and efficient citizen personnel; and
> (5) supplemented by efficient facilities for building and repairing vessels.
> (b) Policy.–It is the policy of the United States to encourage and aid the development and
> maintenance of a merchant marine satisfying [these] objectives....

46 U.S.C. § 50101 (2006).  See also, Marine Carriers Corp. v. Fowler, 429 F.2d 702, 708 (2d Cir.

1970) ("These provisions are unabashedly protectionist.  Their aims are to protect the American

shipping industry already engaged in the coastwise trade, to provide work for American shipyards,

and to improve and enhance the American Merchant Marine.").

Plaintiffs argue that by allowing the "preassembly" of equipment modules outside the United States, the Coast Guard and the NVDC "have not promoted the capability of domestic shipyards to build vessels; instead, the agencies have severely harmed the ability of those shipyards, crippling them to the point that they must rely on foreign shipyards as a crutch in order to construct vessels."  Plaintiffs' Motion at 44.  While American workers can and will construct the vessels' shells, foreign workers will preassemble the interior modules "to such a degree that the vessels' systems and interiors [will be] largely the product of foreign shipyards and foreign workers."  Id.  Plaintiffs passionately argue that such rulings do not advance the purpose of the Jones Act, namely, supporting American shipyards and retaining the capability to produce on United States soil ships for American use.

Government Defendants note that:

[w]hile the Coast Guard is sympathetic to the positions of the metal trades unions, whose duty is to promote the job security and related interests of [their] member workers..., and the shipbuilders, whose duty is to their private economic interests, the Coast Guard is charged by law to implement *all* the enumerated policies of the Jones Act through its administration of the pertinent statutes.

Government Defendants' Motion at 37-38.  In addition to protecting and benefitting domestic shipyards and workers, the Coast Guard must support the "improvement and modernization of the domestic fleet."  NASSCO Motion at 17.

NASSCO asserts that the "Coast Guard's ruling is consistent with the goal of developing a strong domestic fleet.  The existing vessels engaged in the coastwise trade are aging rapidly.  Under the Plaintiffs' crabbed [sic] view of the statute, it is likely that fewer vessels would be commissioned or constructed for coastwise trade" (presumably due to the significantly higher cost

to produce such vessels).  Id.  See also, id. n.8 (citations detailing the age of the American fleet and the need for replacement).  NASSCO argues that the Coast Guard has used its discretion to weigh the relative importance of supporting the American shipbuilding industry and ensuring that the American merchant marine fleet access to modern vessels.  Id. at 19.  The Coast Guard ruling allows American shipyards to continue building vessels without imposing limitations on the source of parts so excessive as to render the American construction of ships too expensive to pursue.[24]

Aker further notes that assembling equipment modules and piping systems is not necessarily a shipyard task.  Although Aker agrees that the coastwise laws are designed to promote United States shipyards, the company notes that Plaintiffs admit that the "assembly and

---

[24]See, Keystone Shipping Co. v. U.S., 801 F. Supp. 771, 778 (D.D.C. 1992) (noting that while there might be more part construction conducted in American shipyards if the Coast Guard ruled that preexisting parts could not be used to refurbish vessels, the statute's language does not require such a limit, and such a limit could reduce the work for shipyards by increasing the overall cost of each project).

Aker argues that prohibiting shipyards from taking advantage of the efficiencies inherent in using foreign-built modules would ultimately harm shipyards and their workers.  Aker asserts that Plaintiffs are wholly ignoring the fact that "the cost of building a vessel in the United States" is a major "factor in determining how many vessels will be built and how many shipyard workers will be needed to build them."  Aker Motion at 28.  Aker asserts that tankers already have lost market share to pipelines and other alternative transportation means, and:

> [p]reventing shipbuilders from using more efficient methods in constructing vessels will increase the vessel owners' capital cost.  This in turn will increase the rates that the vessel owners must charge, decreasing their competitiveness and further reducing their share of the domestic transportation market.  The lower market share will lead to a reduction in the size and number of vessels needed to fulfill the demand for domestic shipping.

Id. at 29.  Plaintiffs question this logic and accuse Aker of seeking further subsidies "in the form of greatly weakened U.S.-build legal requirements" for its business.  Plaintiffs' Opposition to Aker Motion at 24-25 (noting that Aker received government funding and subsidies in order to move to Philadelphia Shipyard).

pre-outfitting of equipment modules intended for commercial vessels" are not necessarily

shipyard tasks because they can be accomplished "at other contractor or subcontractor

facilities...." Complaint ¶ 15. "Assembling and outfitting the equipment modules overseas has

the same effect on domestic shipyards and their workers as assembling and outfitting them at non-

shipyard facilities in the United States, which certainly does not violate the coastwise laws." Aker

Motion at 27-28.

Although the Coast Guard does not address the purposes of the Jones Act at great length,

in its November 15, 2006 denial of Plaintiffs' appeal, it states the following:

> We are, of course, cognizant of the language and intent of the Jones Act and do not by any
> means dismiss your concerns with regard to the preservation of shipbuilding capabilities in
> the United States. But your arguments may, in fact, be undercut somewhat by the fact of
> the reinvigorated shipbuilding presence in the United States, and in Philadelphia in
> particular, represented by the Tankers at issue in this matter. One can only wonder
> whether this would have occurred in the face of the kind of micro approach to the
> "assembly" requirement to which your arguments could lead.

AR at 4.

Because the Coast Guard appears to have considered the Jones Act's purposes in ruling as

it did, this is additional cause for the Court to find that the ruling is not unreasonable. The

"Agency's interpretation need not further *every* statutory purpose in the [maritime] Act. [The

agency's] approach furthers the overall purposes of the statute, and [Plaintiffs have] presented no

reason to disturb the agency's judgment about how best to weigh the individual purposes to

effectuate Congress' overall goals." OSG Bulk Ships v. U.S., 132 F.3d 808, 816 (D.C. Cir. 1998).

Where Congress has entrusted the agency to make these judgment calls, it is not for the courts to

upset the rational balance the agency has struck. See, Fresno Mobile Radio, Inc. v. FCC, 165 F.3d

965, 971 (D.C. Cir. 1999) ("When an agency must balance a number of potentially conflicting

objectives, which there are, judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular.")

The Coast Guard's interpretation of the regulation at issue is reasonable in terms of the text, history and purpose of the Jones Act.  Accordingly, the Court finds that the interpretation at issue is not plainly erroneous or inconsistent and, thus, must be upheld.


**IV.     CONCLUSION**

For the reasons set forth above, the Court will grant Defendants' Motions and deny Plaintiffs' Motion, thus upholding the Coast Guard's interpretation of its regulation.  An appropriate order follows.


                                             BY THE COURT:

                                             **S/Gene E.K. Pratter**
                                             **GENE E.K. PRATTER**
                                             **UNITED STATES DISTRICT JUDGE**

_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PHILADELPHIA METAL TRADES | : | |
| COUNCIL, MTD, AFL-CIO, <u>ET AL</u>., | : | |
| Plaintiffs | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ADMIRAL THAD W. ALLEN, <u>ET AL</u>., | : | NO. 07-145 |
| Defendants | : | |

## ORDER

     **AND NOW,** this 21st day of August 2008, upon consideration of Aker's Motion for

Summary Judgment (Doc. No. 55), NASSCO's Motion for Summary Judgment (Doc. No. 56),

Government Defendants' Motion for Summary Judgment (Doc. No. 58), Plaintiffs' Motion for

Summary Judgment (Doc. No. 59), and the related responses and reply briefs, **IT IS HEREBY**

**ORDERED** that Defendants' Motions for Summary Judgment (Doc. Nos. 55, 56, & 57) are

**GRANTED**, and Plaintiffs' Motion for Summary Judgment (Doc. No. 59) is **DENIED**.

 

                              BY THE COURT:

                              S/Gene E.K. Pratter
                              GENE E.K. PRATTER
                              UNITED STATES DISTRICT JUDGE